UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re<br><br>**THE ACADEMY AT PENGUIN HALL, INC.**<br><br>Debtor. | Chapter 11<br><br>Case No. 25-11191-CJP |

**OPPOSITION BY DEBTOR TO MOTION OF ORIGEN WENHAM LLC
FOR RELIEF FROM THE AUTOMATIC STAY**

The Academy at Penguin Hall, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor" or the "School"), hereby opposes the *Motion of Origen Wenham LLC for Relief from the Automatic Stay with respect to 36 Essex Street, Wenham, Massachusetts* [ECF No. 70] (the "Motion for Relief"). The movant, Origen Wenham LLC ("Origen"), seeks to foreclose on the Debtor's principal asset – a 50-acre parcel of real estate in Wenham, Massachusetts. The Debtor has secured post-petition financing and is engaged in a professional and extensive marketing process to sell that property to make distributions to its creditors. If the motion is granted, Origen's proposed foreclosure will terminate that process and almost certainly preclude recovery by any of the Debtor's other creditor constituencies.

The Motion for Relief should be denied because the Debtor is maintaining and enhancing the value of the property during its chapter 11 case, the Debtor is actively marketing the property for sale through a commercial sale process with a recognized and accomplished broker, and the Debtor's reorganization is both in prospect and in progress.

In further support of this opposition, the Debtor states as follows:

1

**Background**

A.  **The Property.**

1.  On February 1, 2016, the School closed on the purchase of a 50-acre parcel of property and buildings located at 36 Essex Street in Wenham, Massachusetts (the "Property"). The Property is located just north of Beverly, Massachusetts, easily accessible by car, just two miles from route 128. The Property is improved by a 120,000 square foot building secluded in woodland setting. Construction of the building began in 1929 with a 20,000 square foot stone manor house designed by noted architect H.T. Lindeberg. The Property became known as Penguin Hall because of the installation of two life size bronze statues of emperor penguins outside the home. The penguins were a housewarming gift from the famous polar explorer Admiral Richard Byrd and still flank the front entrance today.

2.  In 1960, the Archdiocese of Boston purchased the Property and repurposed it as a novitiate convent for the Sisters of Notre Dame by constructing a four-story brick dormitory building adjacent to the manor house. In 1987, James Mullen ("Mullen") purchased the Property and made significant changes and additions to further repurpose it as the headquarters for his advertising agency, Mullen.

3.  After purchasing the Property from Mullen, the Debtor made significant improvements in connection with its operation as a preparatory school including, without limitation: new fire protection system and upgrades to the fire sprinkler system to meet current building codes; upgrades to the heating, air conditioning, plumbing and electrical systems; roof repairs and upgrades including selective replacement of copper, slate and clay tile components; repointing of brick and stone; reglazing and painting of windows; improvements to the grounds

including parking lots, site lighting, landscaping and hardscaping; numerous interior improvements including new dining facilities and a makeover of the entire interior spaces.

4. In connection with the purchase of the Property, the School issued to Mullen a promissory note in the original principal amount of $9,600,000 (the "Seller's Note"). The obligations under the Seller's Note were secured by a first-priority mortgage on the Property in favor of Mullen (the "Mullen Mortgage").

5. The Debtor financed portions of the build-out of the Property and the operation of the preparatory school with funds from Georgetown Bank, which was ultimately merged into Salem Five Bank ("Salem Five"). In September 2016, the Debtor executed a construction promissory note in the original principal amount of $2,000,000 and a second revolving promissory note also in the original principal amount of $2,000,000 (collectively, the "Salem Five Loans"), which are also secured by a first-priority mortgage and assignment of rents on the Property (the "Salem Five Mortgage"). Mullen agreed to subordinate the Mullen Mortgage to the Salem Five Mortgage.

6. The costs of funding operations while expanding enrollment required the Debtor to borrow additional sums from Salem Five. In 2017, Salem Five increased the amount of its revolving loan to the Debtor to $3,000,000 bringing the total principal obligations under the Salem Five Loans to $5,000,000.

7. In 2019, RS Lyon Property Group, LLC ("Lyon" or the "DIP Lender") acquired the Debtor's obligations to Mullen under the Seller's Note, took assignment of the Mullen Mortgage, and consolidated and reduced the obligations thereunder to the approximate aggregate amount of $4,784,000, providing a substantial benefit to the School.

8.  The School operated from 2016 through June 2025. Mary and Albert Martins were the founders and principal operators of the School. Mary Martins served as the School's president and Albert Martins as trustee and treasurer. The School experienced steady growth and success until the COVID-19 pandemic. Among other things, the School planned to consolidate its multiple debt obligations into tax-exempt bonds and secured a commitment for tax-exempt bond financing on favorable terms. Unfortunately, at the onset of the pandemic, the lender withdrew its commitment and withdrew from the education market entirely. The School was ultimately never able to obtain replacement bond financing.

9.  The School never fully recovered from the effects of the pandemic. Both the lack of bond financing and a general decline in philanthropic contributions caused the School's financial condition to decline. In 2024 and 2025, the School became unable to regularly service its obligations as revenue and donations were lower than projected. The School sought alternative financing to restructure certain of its principal obligations including, without limitation, the Salem Five Loans. When those efforts were unsuccessful, the School determined that it could not continue operations during the 2025-2026 academic year.

**B.    The Debtor's Bankruptcy.**

10. On or about April 2, 2025 and while the School was seeking alternative financing, Origen, a special purpose entity incorporated one month earlier, apparently acquired the Salem Five Loans and took assignment of the Salem Five Mortgage.

11. Upon information and belief, Origen acquired the Salem Five Loans in order to foreclose on the Property. The Debtor attempted to engage with Origen to restructure or otherwise satisfy the obligations under the Salem Five Loans. Among other things, there were disputes with respect to the amount Origen claimed to be owed. While Origen asserted the

4

balance on the loans to be in excess of $8,000,000, it did not provide the Debtor with any accounting, statement, or other support for the substantial interest and fees it included in its claim. Within mere weeks of acquiring the Salem Five Loans, Origen moved to foreclose on the Property and an auction was scheduled for June 11, 2025.

12. The Debtor attempted unsuccessfully to negotiate a resolution of its disputes with Origen and on the morning of June 11, 2025, the Debtor commenced this chapter 11 case in order to prevent the foreclosure.

13. The Debtor estimates that on the Petition Date it owed Origen approximately $6,500,000, RS Lyon, the holder of the second-priority mortgage, approximately $5,000,000, and Garden Street Properties, LLC, the holder of a third priority mortgage on the Property, approximately $600,000. The Internal Revenue Service and the Department of Revenue for the Commonwealth of Massachusetts have filed notices of tax liens against the Property in the approximate respective amounts of $1,048,000 and $150,000 on account of asserted payroll tax obligations.

14. The Debtor estimates that its obligations to unsecured creditors total approximately $12,000,000 in the aggregate inclusive of approximately (a) $375,000 owed to employees of the School for wages, and (b) $640,000 on account of tuition deposits for the 2025-2026 academic year, some of which are entitled to priority.

15. On or about August 6, 2025, an Official Committee of Unsecured Creditors (the "Committee") was appointed and shortly thereafter retained counsel.

C.  **The Debtor's Reorganization.**

16. The Property is the Debtor's principal asset. The Debtor intends to sell the Property through a commercial sale process in order to maximize the return and fund payments to creditors.

17. The Property has significant development value. The Property is the second-largest parcel of real estate in the Town of Wenham. It lies within a zoning overlay which would permit it to be developed into an independent living community without obtaining a zoning variance or similar zoning alteration from the Town. Based upon communications with the Town and others, the Town is desirous of the construction of an age-restricted housing development which would serve a need for the community's aging population.

18. The Debtor has received one expression of interest from a sophisticated developer (the "Interested Developer") which expression of interest represented a sale value to the Debtor of between $20,000,000 and $25,000,000. The Interested Developer is a well-known regional real estate developer that has successfully developed numerous multi-million dollar projects. The Interested Developer was known to the Martins because of its prior business with Martins Construction, and became familiar with the School and the Property through that connection.

19. The Debtor has taken significant steps to market and sell the Property and to advance its reorganization since the commencement of this case. The Debtor conducted a thorough search for potential brokers to aggressively market the Property and solicit offers from willing and able buyers. During that process, multiple brokers estimated potential sale prices for the Property in excess of $20,000,000. On August 25, 2025, the Debtor filed an application to employ Kelleher & Sadowsky Associates, Inc. ("Kelleher") as broker [ECF No. 75]. Kelleher has begun its efforts in earnest and has, among other things, developed a marketing timeline,

prepared a detailed offering memorandum and other marketing materials, begun discussions with the Town, and opened a data room for potential purchasers to review diligence materials related to the Property.

20. The Debtor continues to cultivate interest in the Property from the Interested Developer who has visited the Property on multiple occasions and engaged in due diligence. The Debtor continues to confer and exchange information with the Interested Developer.

21. On August 28, 2025, the Court entered an order approving, on a final basis, a debtor-in-possession financing arrangement which provides that RS Lyon will loan to the Debtor an amount up to $298,874 to fund expenses associated with maintaining the Property and administering the Debtor's bankruptcy proceeding [ECF No. 81] (the "DIP Financing"). RS Lyon and the Debtor closed on the DIP Financing on September 8, 2025. The DIP Financing will fund, among other things:

- a. Ordinary costs and expenses of the Debtor during its chapter 11 case;
- b. Certain chapter 11 administrative expenses;
- c. Insurance premiums on the Property;
- d. Maintenance costs associated with the Property during the chapter 11 case; and
- e. Certain improvements and repairs to the building to enhance its value during the sale process.[1]

22. Approval of the DIP Financing was essential to the Debtor's reorganization efforts. The DIP Financing enables the Debtor to preserve and enhance the value of the Property and pursue a comprehensive sale process during its chapter 11 case. Absent the DIP Financing, it is likely that the Debtor's assets would be subject to waste and ultimately forcibly liquidated,

---

[1] Because the Debtor is a non-profit entity, the Debtor is exempt from real estate taxes from the Town.

resulting in a substantially lower return to its creditors than the orderly sale process which is now progressing.

23. Since the approval of the DIP Financing, the Debtor has worked to make necessary repairs to the Property and otherwise improve its general condition for the proposed sale.

24. Since the appointment of the Committee, the Debtor has worked cooperatively with the Committee and its counsel to address the concerns of creditors, administer the Debtor's estate, and maximize the return to creditors. Among other things, the Committee was able to negotiate with the Debtor and RS Lyon for a carveout from RS Lyon of proceeds of the sale of the Property to benefit unsecured creditors. The carveout is incorporated into the order approving the DIP Financing. The Debtor provides reporting to the Committee and others with respect to the uses of the DIP Financing. The Debtor has consulted with and kept the Committee informed with respect to the retention of Kelleher and the progress of the sale. The Debtor intends to coordinate with the Committee on further reorganization efforts including, without limitation, the formulation and advancement of a plan of reorganization.

D. **The Motion for Relief.**

25. Origen filed the Motion for Relief during the continued hearing on the DIP Financing, approximately ten weeks into the Debtor's reorganization case. Origen sought relief from the stay under substantially different circumstances than currently exist, before the DIP Financing was approved and before the Debtor had the resources to fully engage in its reorganization efforts.

**Opposition**[2]

The Motion for Relief fails to set forth a basis for relief under either Section 362(d)(1) or (d)(2). Origen is adequately protected because the Property is insured, is being well-preserved, and is, at the very least, maintaining its value during the bankruptcy case. As set forth in greater detail below, Origen's purported appraisal is deficient on its face. Regardless, Origen has presented no evidence, through its appraisal or otherwise, that the Property has declined in value since the filing. The Debtor has been proactive in its bankruptcy case, and the orderly sale of the Property and the Debtor's reorganization are well underway.

A.  **Origen Is Not Entitled to Relief under Section 362(d)(1) Because the Property Is Not Declining in Value.**

26. Origen has failed to meet its burden to demonstrate that cause exists to terminate the automatic stay under Section 362(d)(1) of the Code. *See e.g. in re Ledis*, 259 B.R. 472, 475 (Bankr. D. Mass. 2001)(burden on movant to show *prima facie* evidence of cause).

27. Origen purports to be undersecured based upon a two-page cover letter to an appraisal report of the Property by BBG, Inc. dated July 8, 2025 and attached to the Motion for Relief as Exhibit R (the "Cover Letter"). The appraisal report referred to in the Cover Letter is not attached to the Cover Letter or the Motion for Relief. The Cover Letter includes a conclusion that the "Market Value – As Is" of the Property is $8,300,000. The Cover Letter should be disregarded because it is a conclusory summary of an apparently more detailed appraisal report which is not attached to the Motion for Relief. It includes no statement regarding its methodology or any factual bases for its opinion. Among other things, it does not provide any information regarding the valuation approach used by BBG, contains no

---

[2] The Debtor's required responses under MLBR 4001-1(a)(6) are attached to this opposition as Exhibit 1.

information regarding costs of development, income which might be derived from the Property, or any comparable properties which BBG considered in rendering its valuation. As a result, the valuation conclusion set forth in the Cover Letter cannot be assessed or understood.

28. Moreover, the Cover Letter is, by its own terms, not a reliable indication of the value of the Property because no appraisal report is attached. The Cover Letter conspicuously states on the first page:

> **This letter is to remain attached to the report, which should be transmitted in its entirety, in order for the value opinion set forth to be considered valid.**

Cover Letter at 1 (emphasis added).

29. The Debtor disputes that Origen is undersecured.[3] Even if it is, the absence of an equity cushion is insufficient grounds for relief under Section 362(d)(1). The standard is not whether Origen is undersecured, but rather whether the value of Origen's interest in collateral is declining as a result of the automatic stay. *See In re SW Boston Hotel Venture LLC*, 449 B.R. 156 (Bankr. D. Mass. 2011); *In re Cumberland Farms, Inc.*, 162 B.R. 62, 68 (Bankr. D. Mass. 1993) *citing United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (being undersecured is "not equivalent to the creditor lacking adequate protection.") *See also Timbers*, 484 U.S. at 370 (interest of lienholder is not adequately protected if the collateral is depreciating during term of stay).

30. Origen has not presented any evidence of a decline in the value of the Property since the Petition Date. It summarily asserts that the Property has declined in value since 2019,

---

[3] Among other things, the Debtor disputes the valuation conclusion in the Cover Letter for numerous reasons, including that it is conclusory, without any supporting analysis, and substantially below every indication of value of the Property that the Debtor has received to date. In connection therewith, the Debtor reserves its right to supplement this opposition with its own professional appraisal or other opinion of value in connection with any evidentiary hearing on the Motion for Relief. The Debtor similarly disputes the stated amount of Origen's claim. After its acquisition of the Salem Five Loans, Origen asserted to be owed approximately $8,500,000, but has provided no accounting or other support for its substantial claims for interest and fees.

10

4921-8200-5607.2

based upon a 2019 appraisal of the Property for approximately $15,500,000 as opposed to the $8,300,000 valuation conclusion in the Cover Letter. As set forth above, the Cover Letter is not a true indicator of value. The 2019 appraisal is irrelevant given that it was six years prior to the Debtor's chapter 11 case.

31. Since Origen failed to meet its burden under the applicable Section 362(d)(1) standard, it is not entitled to relief. *See e.g. In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continue protection.")

32. If required, the Debtor can demonstrate that the Property has not declined in value and that Origen remains adequately protected. Among other things, the Property is insured and has been regularly maintained since the Debtor's filing. The DIP Financing will provide the funds necessary to continue to maintain and enhance the Property during the sale process and maximize the potential return from a sale.

B. **Origen Is Not Entitled to Relief under Section 362(d)(2) Because the Debtor's Reorganization is in Prospect.**

33. In order to successfully oppose the Motion for Relief under Section 362(d)(2), the Debtor only need only show that the Property is essential for an effective reorganization which is in prospect and that there is "'a reasonable possibility of a successful reorganization within a reasonable time.'" *In re Mellino*, 333 B.R. 578, 584 (Bankr. D. Mass. 2005) *quoting United Savings Ass'n of Texas*, 484 U.S. at 376, 108 S.Ct. 626.[4]

---

[4] As set forth above, the Debtor does not concede that there is no equity in the Property and reserves its rights to submit evidence of value at any evidentiary hearing on the Motion for Relief.

11

34. The Property is the Debtor's principal asset and the Debtor proposes to use the proceeds from its sale to fund payments to creditors under a plan of reorganization. To satisfy its burden under Section 362(d)(2), the Debtor need not demonstrate that it has a plan which is confirmable, only that the confirmation of a plan is with the realm of possibility. *SW Boston*, 449 B.R. at 178 *citing In re Mullock*, 404 B.R. 800, 806 (Bankr. E.D. Pa. 2009) (internal citations omitted). Courts, including those in this District, have developed and utilized an illustrative, non-exhaustive list of showings appropriate to meet the debtor's burden including:

    a. The debtor is moving meaningfully to propose a plan;

    b. The plan provides for the lender's allowed secured claim to be valued and payable from a sale or other viable means;

    c. The plan has a realistic chance of confirmation;

    d. The plan must not be unconfirmable, without applying the same scrutiny as would be applied at the time of confirmation; and

    e. The reorganization must occur within a reasonable period of time.

*In re Building 62 Ltd. P'ship*, 132 B.R. 219, 222 (Bankr. D. Mass. 1991).

35. Determinations under Section 362(d)(2) may differ based upon a debtor and the particular case. As one court recognized:

> Some reorganizations might be relatively simple, requiring nothing more than restructuring debts to creditors in order to overcome temporary cash flow problems. Others might be more complicated and can involve … seeking third-party financing, and negotiating with large numbers of creditors. Thus, depending upon the debtor and what it needs to do in order to reorganize its affairs, a successful reorganization can, quite reasonably, be a matter of only a few months, or several years, or anywhere in between…[W]hat §362(d)(2) calls for is much more of a discretionary inquiry, rather than a mechanical one, which, at bottom, requires the court to make a judgment call as to whether the debtor is making sufficient progress towards a sufficiently realistic goal such that efforts should be allowed to continue.

*In re Brian Wise Trucking, Inc.*, 386 B.R. 215 (Bankr. N.D. Ind. 2008).

36. Contrary to Origen's conclusory statements in the Motion for Relief, the Debtor can more than meet its burden here. The Debtor's case is approximately three months old and the exclusivity period has not expired. The Debtor has secured funds to pay its administrative expenses during the sale process, including insurance and regular maintenance expenses by virtue of the DIP Financing. The Debtor has taken steps to market and sell the Property to fund its reorganization and provide the maximum return to creditors. The parameters of that sale are not limited to any certain sale price and the Debtor is engaged in a full marketing process with a professional and experienced commercial broker. The Debtor continues to work cooperatively with the Committee, which supports the Debtor's sale efforts and will coordinate with the Committee to file and seek confirmation of a plan of reorganization within a reasonable time.

## Conclusion

The Debtor is maintaining the Property and the Property has not declined in value since the commencement of the Debtor's case. The Debtor is working with the Committee to reorganize and pay creditors in a reasonable time. Accordingly, Origen is not entitled to relief under Section 362(d)(1) or (d)(2).

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, based upon the foregoing, the Debtor requests that the Court enter an order denying the Motion for Relief and granting to the Debtor such other and further relief as is just and proper.

                          Respectfully Submitted,

                          THE ACADEMY AT PENGUIN HALL, INC.,
                          By Its Attorneys,

                          */s/ Christopher M. Condon*
                          Christopher M. Condon (BBO #652430)
                          BOWDITCH & DEWEY, LLP
                          75 Federal Street, Suite 1000
                          Boston, Massachusetts 02110
                          Tel: (617) 757-6513
Date: August 10, 2025           Email: ccondon@bowditch.com

## CERTIFICATE OF SERVICE

I, Christopher M. Condon, hereby certify that on September 10, 2025, I caused a copy of the foregoing opposition to be filed through CM/ECF system and served electronically upon all parties entitled to notice thereunder including counsel to Origen Wenham LLC.

                          */s/ Christopher M. Condon*
                          Christopher M. Condon

## Exhibit 1

## Responses pursuant to MLBR 4001(a)(6)

- The Academy at Penguin Hall, Inc. (the "Debtor") is without sufficient information to admit or deny the allegations in Paragraph 1 and, therefore, denies same.

- The Debtor admits the allegations in Paragraph 2.

- With respect to the allegations in Paragraph 3, the Debtor states that the documents referenced therein speak for themselves. The Debtor is without sufficient information to admit or deny the denies the remaining allegations in Paragraph 3 and, therefore, denies same. The Debtor does not make any representations with respect to the amount of any claim by Origen[1] or the priority, validity or extent of any lien held by Origen and specifically reserves its rights with respect to the documents between itself and Origen and any amounts or liens claimed by Origen with respect to the Property.

- With respect to the allegations in Paragraph 4, the Debtor states that the documents referenced therein speak for themselves. The remaining allegations in Paragraph 4 require no response.

- The allegation in Paragraph 5 constitutes a conclusion of law to which no response is required. To the extent a response is required, the Debtor denies such allegation.

- With respect to the allegations in Paragraph 6, the Debtor states that the document referenced therein speaks for itself. The remaining allegations in Paragraph 6 constitute conclusions of law to which no response is required. To the extent a response is required, the Debtor denies such allegations.

- The allegation in Paragraph 7 constitutes a conclusion of law to which no response is required. To the extent a response is required, the Debtor denies such allegation.

- With respect to the allegations in Paragraph 8, the Debtor states that the document referenced therein speaks for itself. The remaining allegations in Paragraph 8 constitute conclusions of law to which no response is required. To the extent a response is required, the Debtor denies such allegations.

- The allegations in Paragraph 9 constitute conclusions of law to which no response is required. To the extent a response is required, the Debtor denies such allegations.

- With respect to the allegation in Paragraph 10, the Debtor states that the document referenced therein speaks for itself.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the foregoing Opposition by Debtor to Motion of Origen Wenham LLC for Relief from the Automatic Stay.

1

- The allegation in Paragraph 11 constitutes a conclusion of law to which no response is required. To the extent a response is required, the Debtor denies such allegation.

- The Debtor is without sufficient information to admit or deny the allegations in Paragraph 12 and, therefore, denies same.

- The Debtor admits the allegation in Paragraph 13.

- The Debtor admits the allegation in Paragraph 14.

- The Debtor is without sufficient information to admit or deny the allegations in Paragraph 15 and, therefore, denies same.

- With respect to the allegations in Paragraph 16, the Debtor states that the documents referenced therein speak for themselves. The Debtor is without sufficient information to admit or deny the denies the remaining allegations in Paragraph 16 and, therefore, denies same. The Debtor does not make any representations with respect to the amount of any claim by any party or the priority, validity or extent of any lien held by any party and specifically reserves its rights with respect to the documents between itself and the parties referred to in Paragraph 16 and any amounts or liens claimed by parties in Paragraph 16 with respect to the Property.

- The allegations in Paragraph 17 constitute conclusions of law to which no response is required. To the extent a response is required, the Debtor denies such allegations.

- The Debtor denies the allegations in Paragraph 18.

- With respect to the allegations in Paragraph 19, the Debtor states that the documents referenced therein speak for themselves. The Debtor admits that it has received one expression of interest from the Interested Developer which expression of interest represented a sale value to the Debtor of between $20,000,000 and $25,000,000. The Interested Developer was known to the Martins because of its prior business with Martins Construction, and became familiar with the School and the Property through that connection. The Debtor is without sufficient information to admit or deny the denies the remaining allegations in Paragraph 19 and, therefore, denies same.

- With respect to the allegations in Paragraph 20, the Debtor states that the documents referenced therein speak for themselves. The Debtor admits the remaining allegations in Paragraph 20.

- The allegations in Paragraph 21 constitute conclusions of law to which no response is required. To the extent a response is required, the Debtor denies such allegations.

- The Debtor is without sufficient information to admit or deny the allegations in Paragraph 22 and, therefore, denies same.

- The Debtor admits that it executed loan documents in connection with a loan arrangement with Georgetown Bank.  The Debtor is without sufficient information to admit or deny the remaining allegations in Paragraph 23 and, therefore, denies same.

- The allegation in Paragraph 24 constitutes a conclusion of law to which no response is required.  To the extent a response is required, the Debtor denies such allegation.

- The allegations in Paragraphs 25-29 constitute conclusions of law to which no response is required.  To the extent a response is required, the Debtor denies such allegations.

- The Debtor denies the allegations in Paragraph 30.

- The Debtor denies the allegations in Paragraph 31.

- The Debtor denies the allegations in Paragraph 32.

- The allegation in Paragraph 33 constitutes a conclusion of law to which no response is required.  To the extent a response is required, the Debtor denies such allegation.

- The allegations in Paragraphs 34-38 constitute conclusions of law to which no response is required.  To the extent a response is required, the Debtor denies such allegations.

- The allegation in the first sentence of Paragraph 39 constitutes a conclusion of law to which no response is required.  To the extent a response is required, the Debtor denies such allegation.  The Debtor admits the allegation in the second sentence of Paragraph 39.  The Debtor denies the allegation in the third sentence of Paragraph 39.  The remaining allegations in Paragraph 39 constitute conclusions of law to which no response is required.  To the extent a response is required, the Debtor denies such allegations.

- The allegation in Paragraph 40 constitutes a conclusion of law to which no response is required.  To the extent a response is required, the Debtor denies such allegation.

- The allegation in Paragraph 41 constitutes a request for relief to which no response is required.  To the extent a response is required, the Debtor denies such allegation.